

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA, *ex rel.,*
WILLIAM VICTOR O'BOYLE
6490 State Road A-1
Parma, Ohio 44134

           Plaintiff,

BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF AMERICA

UNITED STATES ATTORNEY
 United States Court House
801 West Superior Ave. Suite 400
Cleveland, OH 44113

and

ATTORNEY GENERAL OF
THE UNITED STATES
U.S. Department of Justice
10th and Constitution Avenues, N.W.
Washington, DC 20530

vs.

CLEVELAND CLINIC FOUNDATION
9500 Euclid Avenue,
Cleveland, OH 44195

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**1:07 CV 2786**

COMPLAINT

FILED **UNDER SEAL**
PURSUANT TO
31 U.S.C. '3730(b)(2)

**JUDGE GAUGHAN**

MAG. JUDGE PERELMAN

**JURY TRIAL
DEMANDED**

Page 1

ST. VINCENT CHARITY HOSPITAL )
 2351 East 22nd Street )
Cleveland, OH 44115 )
 )
LAKEWOOD HOSPITAL )
14519 Detroit Avenue, )
Lakewood, OH 44107 )
 )
LAURELWOOD HOSPIATAL )
35900 Euclid Avenue )
Willoughby, OH 44094 )
 )
LUTHERAN HOSPIATL )
1739 W. 25th Street )
Cleveland, OH 44113 )
 )
MARYMOUNT HOSPITAL )
12300 McCracken Road, )
Garfield Heights, OH 44125 )
 )
MERIDIAN HURON ROAD HOSPITAL )
13951 Terrace Road )
East Cleveland, OH 44112 )
 )
UNIVERISTY HOSPITALS )
11100 Euclid Avenue )
Cleveland, OH 44106 )
 )
WINDSOR HOSPITAL )
115 Summit Drive )
Chagrin Falls Ohio. )
 )
RUDWICK MANOR SPECIAL CARE CENTER )
17322 Euclid Avenue )
Cleveland, OH  44112 )
 )
UNIVERSITY MANOR HEALTH )
CARE CENTER, Inc )
2186 Ambleside Road )
Cleveland, OH  44106 )
 )
CLEVELAND REHAB AND SPECIAL )
CARE CENTER )
8800 Carnegie Ave )
Cleveland, OH  44106 )

SABER Health Care Group  )
26691 Richmond Road  )
Cleveland, OH 44146  )
 )
BILL WEISBURG  )
26691 Richmond Road,  )
Cleveland, OH 44146  )
 )
ARISTOCRAT BEREA NURSING HOME  )
255 Front Street  )
Berea, OH 44017  )
 )
NORTHWESTERN CENTER  )
570 North Rocky River Drive  )
Berea, OH 44017  )
 )
CITYVIEW MANOR  )
6606 Carnegie Avenue  )
Cleveland, OH 44103  )
 )
GREENBRIER SENIOR LIVING COMMUNITY  )
6455 Pearl Road  )
Parma Heights OH 44130  )
 )
COMMUNICARE HEALTH SERVICES  )
4700 Ashwood Drive, Suite 200  )
Cincinnati, Ohio 45241  )
 )
FRANKLIN PLAZA EXTENDED CARE  )
3600 Franklin Boulevard  )
Cleveland, OH 44113  )
 )
RAE ANN CENTER  )
4650 Rocky River Drive  )
Cleveland, OH 4413  )
 )
BRAEVIEW MANOR  )
20611 Euclid Avenue  )
Euclid, OH 44117  )
 )
PATRICIAN SKILLED NURSING CENTER  )
9001 West 130th Street  )
North Royalton, OH 44133  )
 )

Page 3

CARRINGTON PARK                              )
2217 West Ave.                               )
Ashtabula, Ohio, 44004                       )
                                             )
CANTON HEALTH CARE                           )
1223 Market Ave.                             )
N. Canton, Ohio, 44714                       )
                                             )
ROSA ROSALES SO, MD                          )
c/o Saint Vincent's Charity Hospital         )
 2351 East 22nd Street,                 )
Cleveland, OH 44115.                         )
                                             )
SAMUEL A. NIGRO, MD,                         )
c/o Saint Vincent's Charity Hospital         )
2351 East 22nd Street,                  )
Cleveland, OH 44115                          )
                                             )
GREGORY HALL, MD                             )
3600 Euclid Ave. Suite 100                   )
Cleveland OH,                                )
                                             )
M.T. SHETH, MD                               )
16173 Libby Road,                            )
Maple Heights, OH.                           )
                                             )
M. DAYEM , MD                                )
c/o Marymount Hospital                       )
12300 McCracken Road,                        )
Garfield Heights, OH 44125                   )
                                             )
SAROJ BRAR, MD,                              )
c/o  Lakewood Hospital                       )
14519 Detroit Avenue                         )
Lakewood, OH 44107                           )
                                             )
MANUEL GORDILLO, MD                          )
c/o Lakewood Hospital                        )
14519 Detroit Avenue,                        )
Lakewood, OH 44107                           )
                                             )
RAKESH RANJAN, MD                            )
c/o Marymount Hospital                       )
12300 McCracken Road,                        )
Garfield Heights, OH 44125                   )
                                             )

Page 4

JUNG EL MALLAWANY, MD )
c/o Marymount Hospital )
12300 McCracken Road )
Garfield Heights, OH 44125 )
)
MARC HOROWITZ, MD )
c/o Huron Road Hospital, )
13951 Terrace Road, )
East Cleveland, OH 44112 )
)
DOUGLAS MCLAUGHLIN, MD, )
c/o Huron Road Hospital )
3951 Terrace Road, )
East Cleveland, OH 44112 )
)
TODD GATES, DO )
c/oWinsdsor Hospital )
115 Summit Drive )
Chagrin Falls Ohio. )
)
PATRICK ENDERS, MD, )
c/o Winsdsor Hospital )
115 Summit Drive )
Chagrin Falls Ohio. )
)
ABU N. SYED MD )
c/o Lutheran Hospital )
1739 W. 25th Street )
Cleveland, OH 44113 )
)
BORAS ROYAK, MD )
c/o Lutheran Hospital )
1739 W. 25th Street )
Cleveland, OH 44113 )
)
AVTAR SARAN MD, )
50 Severance Circle )
Cleveland Heights, OH )
)
ROBERT SMITLEY, MD, )
c/o Greenbrier Senior Living Community )
6455 Pearl Road )
Parma Heights OH 44130 )
)
)
)

UPMA DINGRHA, MD             )
c/o Patrician Nursing Home     )
9001 West 130th Street        )
North Royalton, OH 44133     )
                                   )
DENTON WYSE, MD           )
c/o Franklin Plaza Extended Care   )
3600 Franklin Boulevard       )
Cleveland, OH 44113         )
                Defendants.   )
                                   )

This is a *qui tam* action under 31 U.S.C. Sec. 3729, *et seq.* of the False Claims Act filed by Relator/Plaintiff William Victor O'Boyle, in the name of the United States Government and himself, to recover penalties and damages arising from Defendants' violations of federal requirements concerning contracts with agencies of the United States, specifically Medicaid and Medicare healthcare programs.

## I. JURISDICTION AND VENUE

1.      Plaintiff, William Victor O'Boyle, hereby alleges causes of action under 31 U.S.C. sections 3729 *et. seq.* of the False Claims Act, arising from Defendants' claims made to agencies of the United States Government, specifically Medicaid health programs, which are components of the U.S. Department of Health and Human Services.

2.      Plaintiff, O'Boyle is the original source of all the allegations contained in this Complaint.

3.      There has been no public disclosure of the allegations contained in this complaint.

4.      Pursuant to the requirements of the False Claims Act 31 U.S.C. § 3729, *et. seq.*, the plaintiff has provided the government with a confidential disclosure statement and exhibits to substantiate her allegations.

5.  Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3732 and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

6.  The Defendants are groups of psychiatric hospitals, nursing facilities and their owners and medical professionals who work at or are affiliated with the psychiatric hospitals or nursing facilities.

7.  The Defendants, all do business in Ohio and most maintain offices in Ohio.

8.  Defendant, Cleveland Clinic Foundation of 9500 Euclid Avenue, Cleveland, OH 44195

9.  Defendant, St. Vincent Charity Hospital of 2351 East 22nd Street, Cleveland, OH 44115

10. Defendant, Lakewood Hospital of 14519 Detroit Avenue, Lakewood, OH 44107

11. Defendant, Laurelwood Hospital of 35900 Euclid Avenue, Willoughby, OH 44094

12. Defendant, Lutheran Hospital of 1739 W. 25th Street, Cleveland, OH 44113

13. Defendant, Marymount Hospital 12300 McCracken Road, Garfield Heights, OH 44125

14. Defendant, Meridian Huron Road Hospital of 13951 Terrace Road, East Cleveland, OH 44112

15. Defendant, University Hospitals of 11100 Euclid Avenue, Cleveland, OH 44106

16. Defendant, Windsor Hospital, 115 Summit Drive, Chagrin Falls Ohio.

17. Defendant, Rudwick Manor Special Care Center of 17322 Euclid Ave Cleveland, OH 44112

18.    Defendant, University Manor Health Care Center, Inc 2186 Ambleside Rd Cleveland, OH 44106

19.    Defendant, Cleveland Rehab and Special Care Center of 8800 Carnegie Ave Cleveland, OH 44106

20.    Defendant, Health Care Group ("SABER") of 26691 Richmond Road, Cleveland, OH 44146, is the owner of several Nursing Homes. SABER owns the facilities listed above including but not limited to Rudwick Manor, University Manor and Cleveland Rehab and Special Care Center, listed above all located in Cuyahoga County, Ohio.

21.    Defendant, Bill Weisburg of 26691 Richmond Road, Cleveland, OH 44146 is the principal owner of SABER Health Group.

22.    Defendant, Aristocrat Berea Nursing Home 255 Front Street Berea, OH 44017

23.    Defendant, Northwestern Center of 570 North Rocky River Drive Berea, OH 44017

24.    Defendant, Cityview Manor of 6606 Carnegie Avenue Cleveland, OH 44103

25.    Defendant, Greenbrier Senior Living Community of 6455 Pearl Road, Parma Heights OH 44130

26.    Defendant, Communicare Health Services, 4700 Ashwood Drive, Suite 200 Cincinnati, Ohio 45241, owns Aristocrat Berea Nursing Home, Cityview Manor, and Greenbrier Senior Living Community.

27.    Defendant, Franklin Plaza Extended Care 3600 Franklin Boulevard Cleveland, OH 44113

28.    Defendant, Rae Ann Center of 4650 Rocky River Drive Cleveland, Oh 4413

29. Defendant, Braeview Manor of 20611 Euclid Avenue Euclid, OH 44117

30. Defendant, Patrician Skilled Nursing Center of 9001 West 130th Street North Royalton, OH 44133

31. Defendant, Carrington Park, 2217 West Ave., Ashtabula, Ohio, 44004

32. Defendant, Canton Health Care, 1223 Market Ave. N. Canton, Ohio, 44714

33. Defendant, Rosa Rosales So, MD, Psychiatry House Physician, Saint Vincent's Charity Hospital of 2351 East 22nd Street, Cleveland, OH 44115.

34. Defendant, Samuel A. Nigro, MD, of Saint Vincent's Charity Hospital 2351 East 22nd Street, Cleveland, OH 44115

35. Defendant, Gregory Hall, MD of 3600 Euclid Ave. Suite 100 Cleveland OH

36. Defendant, M.T. Sheth, MD of 16173 Libby Road, Maple Heights, OH.

37. Defendant, M. Dayem was a Psychiatrist at Rudwick Manor and is currently at Marrymount Hospital 12300 McCracken Road, Garfield Heights, OH 44125

38. Defendant, Saroj, Brar, MD, of 14519 Detroit Avenue, Lakewood, OH 44107

39. Defendant, Manuel Gordillo, MD of 14519 Detroit Avenue, Lakewood, OH 44107

40. Defendant, Raksh Ranjan, MD, Psychiatrist of Marymount Hospital 12300 McCracken Road, Garfield Heights, OH 44125

41. Defendant, Jung El Mallawany, MD of Marymount Hospital, 12300 McCracken Road, Garfield Heights, OH 44125

42. Defendant, Marc Horowitz, MD, Psychiatrist, Huron Hospital, 13951 Terrace Road, East Cleveland, OH 44112

43. Defendant, Douglas McLaughlin, MD, of Huron Road Hospital, 13951 Terrace Road, East Cleveland, OH 44112

44. Defendant, Todd Gates, DO, of Winsdsor Hospital, 115 Summit Drive, Chagrin Falls Ohio.

45. Defendant, Patrick Enders, MD, of Winsdsor Hospital 115 Summit Drive, Chagrin Falls Ohio.

46. Defendant, Abu N. Syed, MD of Lutheran Hospital 1739 W. 25th Street, Cleveland, OH 44113

47. Defendant, Boras Royak, MD of Lutheran Hospital 1739 W. 25th Street, Cleveland, OH 44113

48. Defendant, Avtar Saran MD, of 50 Severance Circle, Cleveland Heights, OH

49. Defendant, Robert Smitley, MD, of Greenbrier Senior Living Community of 6455 Pearl Road, Parma Heights OH 44130

50. Defendant, Upma Dingrha, MD of Patrician Nursing Home 9001 West 130th Street North Royalton, OH 44133

51. Defendant, Denton Wyse MD of Franklin Plaza Extended Care of 3600 Franklin Boulevard Cleveland, OH 44113

52. Venue and jurisdiction are proper in the United States District Court, for the Northern District of Ohio pursuant to 28 U.S.C. Section 1391(c) and 31 U.S.C. Section 3732 as the Defendants are a group of organizations and persons subject to personal jurisdiction in the State of Ohio.

## II. FACTS

### 1. THE PARTIES INVOLVED

## A. PLAINTIFF

53.  The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

54.  Plaintiff/Relator, William Victor O'Boyle worked as a Clinical Evaluator and Pre-Admission Screen and Resident Review or "PASRR" assessor for the Center for Families and Children in Cleveland Ohio for more than 12 years.   He recently resigned his position as an assessor.

55.  Mr. O'Boyle holds a Master of Community and Agency Counseling degree from Cleveland State University as of 1988 and earned his Independent Counseling License from Cleveland State University in 1995.  As an assessor, Mr. O'Boyle examined patients to determine their appropriate level of care and if they were eligible either to be admitted to, or to stay in, a nursing home facility in Cuyahoga County, Ohio.

## B. DEFENDANT PSYCHIATRIC FACILITIES

56.  Defendant Cleveland Clinic Foundation of 9500 Euclid Avenue, Cleveland, OH 44195 is a hospital with a psychiatric service that regularly refers patients to nursing facilities.

57.  Defendant, St. Vincent Charity Hospital of 2351 East 22nd Street, Cleveland, OH 44115 is a hospital with a psychiatric service that regularly refers patients to nursing facilities.

58.  Defendant, Lakewood Hospital of 14519 Detroit Avenue, Lakewood, OH 44107 is a hospital with a psychiatric service that regularly refers patients to nursing facilities.

59.   Defendant, Laurelwood Hospital of 35900 Euclid Avenue, Willoughby, OH 44094 is a hospital with a psychiatric service that regularly refers patients to nursing facilities.

60.   Defendant, Lutheran Hospital of 1739 W. 25th Street, Cleveland, OH 44113 is a hospital with a psychiatric service that regularly refers patients to nursing facilities.

61.   Defendant, Marymount Hospital 12300 McCracken Road, Garfield Heights, OH 44125 is a hospital with a psychiatric service that regularly refers patients to nursing facilities.

62.   Defendant, Meridian Huron Road Hospital of 13951 Terrace Road, East Cleveland, OH 44112 is a hospital with a psychiatric service that regularly refers patients to nursing facilities.

63.   Defendant, University Hospitals of 11100 Euclid Avenue, Cleveland, OH 44106 is a hospital with a psychiatric service that regularly refers patients to nursing facilities.

64.   Defendant, Windsor Hospital, 115 Summit Drive, Chagrin Falls Ohio.

## C. DEFENDANT NURSING FACILITIES AND OWNERS OF NURSING FACILITIES

65.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

66.   Defendant, Rudwick Manor Special Care Center of 17322 Euclid Ave Cleveland, OH 44112 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

67. Defendant, University Manor Health Care Center, Inc 2186 Ambleside Rd Cleveland, OH 44106 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

68. Defendant, Cleveland Rehab and Special Care Center of 8800 Carnegie Ave Cleveland, OH 44106 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

69. Defendant, Health Care Group ("SABER") of 26691 Richmond Road, Cleveland, OH 44146, is the owner of several Nursing Facilities. SABER owns the facilities listed above including but not limited to Rudwick Manor, University Manor and Cleveland Rehab and Special Care Center, listed above all located in Cuyahoga County, Ohio.

70. Defendant, Bill Weisburg of 26691 Richmond Road, Cleveland, OH 44146 is the principal owner of SABER Health Group.

71. Defendant, Aristocrat Berea Nursing Home 255 Front Street Berea, OH 44017 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

72. Defendant, Northwestern Center of 570 North Rocky River Drive Berea, OH 44017 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

73. Defendant, Cityview Manor of 6606 Carnegie Avenue Cleveland, OH 44103 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

74.   Defendant, Greenbrier Senior Living Community of 6455 Pearl Road, Parma Heights OH 44130 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

75.   Defendant, Communicare Health Services, 4700 Ashwood Drive, Suite 200 Cincinnati, Ohio 45241, owns Aristocrat Berea Nursing Home, Cityview Manor, and Greenbrier Senior Living Community.

76.   Defendant, Franklin Plaza Extended Care 3600 Franklin Boulevard Cleveland, OH 44113 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

77.   Defendant, Rae Ann Center of 4650 Rocky River Drive Cleveland, Oh 4413 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

78.   Defendant, Braeview Manor of 20611 Euclid Avenue Euclid, OH 44117 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

79.   Defendant, Patrician Skilled Nursing Center of 9001 West 130th Street North Royalton, OH 44133 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

80.   Defendnat, Carrington Park, 2217 West Ave., Ashtabula, Ohio, 44004 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

81.   Defendant, Canton Health Care, 1223 Market Ave. N. Canton, Ohio, 44714 is a nursing facility that regularly accepts patients referred to it from psychiatric hospitals or hospitals with a psychiatric service.

## D. DEFENDANTS WHO ARE KEY PERSONNELL

82.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

83.   Dr. Rosa Rosales So, MD, is a Psychiatry House Physician, Saint Vincent's Charity Hospital of 2351 East 22nd Street, Cleveland, OH 44115

84.   Defendant, Dr. Samuel A. Nigro, MD, also works at Saint Vincent's Charity Hospital 2351 East 22nd Street, Cleveland, OH 44115

85.   Defendant, Dr. Gregory Hall, MD of 3600 Euclid Ave. Suite 100 Cleveland OH, is Medical Director of SABER Healthcare group facilities including Rudwick Manor, University Manor, and Cleveland Rehab and Special Care Center See above.

86.   Defendant,. M.T. Sheth, MD of 16173 Libby Road, Maple Heights, OH. Is the Former Medical Director at Cleveland Rehab and Rudwick Manor

87.   Defendant, M. Dayem was a Psychiatrist at Rudwick Manor and is currently at Marymount Hospital 12300 McCracken Road, Garfield Heights, OH 44125.

88.   Defendant, Saroj, Brar, MD, is a Psychiatrist, Lakewood Hospital, 14519 Detroit Avenue, Lakewood, OH 44107 and also is a staff psychiatrist at Cityview Nursing Home and the Patrician Nursing facility,

89.   Defendant, Manuel Gordillo, MD is a Psychiatrist Lakewood Hospital 14519 Detroit Avenue, Lakewood, OH 44107

90.  Defendant, Rakesh Ranjan, MD,  Psychiatrist, of Marymount Hospital, 12300 McCracken Road, Garfield Heights, OH 44125

91.  Defendant, Jung El Mallawany, MD is a Psychiatrist Marymount Hospital, 12300 McCracken Road, Garfield Heights, OH 44125

92.  Defendant,  Marc Horowitz, MD, Psychiatrist, Huron Hospital, 13951 Terrace Road, East Cleveland, OH 44112

93.  Defendant,  Douglas McLaughlin, MD, is a Psychiatrist, Huron Road Hospital, 13951 Terrace Road, East Cleveland, OH 44112 and 11100 Euclid Ave, Cleveland, OH

94.  Defendant, Todd Gates, DO is on Staff at Winsdsor Hospital, 115 Summit Drive, Chagrin Falls Ohio.

95.  Defendant, Patrick Enders, MD, is a Psychiatrist at Winsdsor Hospital 115 Summit Drive, Chagrin Falls Ohio.

96.  Defendant Abu N. Syed MD is a psychiatrist at Lutheran Hospital Psychiatrist 1739 W. 25th Street, Cleveland, OH 44113

97.  Defendant,  Boras Royak, MD is a Psychiatrist Lutheran Hospital 1739 W. 25th Street, Cleveland, OH 44113

98.  Defendant, Avtar Saran MD, was formerly a Psychiatrist, Cleveland Clinic 9500 Euclid Avenue, Cleveland, OH 44195, and is  currently at 50 Severance Circle, Cleveland Heights, OH

99.  Defendant, Robert Smitley, MD, is a Psychiatrist, Greenbrier Senior Living Community of 6455 Pearl Road, Parma Heights OH 44130

100. Defendant, Upma Dingrha, MD is a psychiatrist at Patrician Nursing Home 9001 West 130th Street North Royalton, OH 44133

101. Defendant Denton Wyse, MD is a Psychiatrist Franklin Plaza Extended Care of 3600 Franklin Boulevard Cleveland, OH 44113

## 2. FACTUAL BASIS OF ALLEGATIONS

### A. INTRODUCTION

102. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

103. The Plaintiff/Relator, William Victor O'Boyle personally witnessed the fraud conducted by the parties listed above as defendants. The Relator observed the fraud and tried to prevent it while serving as a Pre-Admission Screen and Resident Review (Hereinafter "PASRR") assessor.

104. In this position, Mr. O'Boyle conducted thousands of assessments to determine the level of care a patient would need.

105. It was his assessment which the Ohio Department of Mental Health, (hereinafter "ODMH") generally would adopt to decide if a patient needed nursing facility Care or should be kept at a psychiatric hospital or simply released.

106. Mr. O'Boyle encountered approximately 1500 patients who did not need the 24 hour care envisioned by the regulations for admittance to and housing in a nursing facility.

107. Yet, the patients were admitted to just such a facility.

108.　To facilitate transfers from a psychiatric hospital to a nursing facility Doctors and Social workers made false written statements about the condition of many patients. They certified that twenty four hour care was needed.

109.　They stated and that the resident needed hands on assistance with at least 2 activities of daily living (herein referred to as ADL's) or 1 ADL and assistance with medication.

110.　Nursing facilities accepted patients and kept them, knowing that the patients did not meet the criteria for intermediate level care.

111.　The expenses to provide people in such facilities are born principally by federal government through funds administered by the Ohio Department of Public Health and the federal Medicaid Programs.

112.　There has been no public disclosure of the allegations presented herein.

113.　The Relator, by virtue of working to screen patients for mental illness in his job independently and directly encountered many instances of fraud. The Relator is the original source of all the allegations presented herein.

## B. BACKGROUND ON ADMISSION CRITIRIA AND PROCEDURES

114.　The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

115.　When a patient is first admitted to a psychiatric hospital or a facility that handles psychiatric patients in Cuyahoga County Ohio, that facility conducts a review, and absent a much more serious diagnosis, can only keep the patient for a limited period of time and receive insurance funds for the patient.

116.    If the patient is to be referred from a psychiatric facility to a Nursing Home the patient must meet certain criteria.

117.    The Ohio Administrative Code section 5101:3-3-15 (A) makes clear that any admission to a nursing facility for a mentally ill patient must meet certain criteria as follows:

> ...The evaluation of an individual's LOC needs determines the facility type for which Medicaid vendor payment can be made. An intermediate LOC [Level of Care] or skilled LOC is necessary for NF admission. Except as provided for in paragraph (G) of this rule, medicaid vendor payment can be initiated to a NF only when the individual's LOC determination is intermediate LOC or skilled LOC.

Ohio Administrative Code 5101:3-3-15 (A)

118.    The criteria are the same regardless of whether the patient is admitted under an initial 30 day convalescent stay or a 180 stay.

119.    The forms used to evaluate patients to determine whether they should be admitted to a nursing facility may be found at the Ohio Department of Mental health Website http://www.mh.state.oh.us/medicaldirdiv/pasrr/pasrr.resources.html.

120.    The Ohio Administrative Code Section 5101-3-3-06 sets the criteria for a patient to meet the intermediate level of care contemplated by a referral to a nursing facility.

121.    There are essentially three ways a mentally ill patient could satisfy the criteria to be admitted into a nursing facility.

122.    First if they have a physical medical condition which requires a "hands on assistance with at least two Activities of Daily Living ("ADL's") and or medication administration." Admission would also be allowed if they need hands on assistance with 1 ADL and hands on administration of the medication.

123.   There are a total of 6 ADL's listed in the Ohio Administrative Code Section 5103-3-06 (2)(a) and (b) as follows:

>   Bathing
>   Dressing
>   Grooming
>   Toileting
>   Eating
>   Mobility

124.   Each of these ADL's are rated on the form required for an admission.

125.   Of course, a mentally ill patient could meet the criteria on strictly physical requirements as set forth above.

126.   The second way for a mentally ill patient to gain admittance is if that patent requires  some sort of Skilled Service as listed under the Ohio Administrative Code Section 5103-3-06 (2)(c)such as the following:

>   Physical Therapy
>   Occupational Therapy
>   Speech Therapy
>   Dialysis
>   Skilled Nursing

127.   The Third way to meet the criteria is if the patient needed 24 hour supervision because of cognitive impairment *See*, Ohio Administrative Code Section 5103-3-06 (2)(d)

128.   As a practical matter the easiest criteria to meet are the requirement for 2 ADL's or one ADL and supervisory assistance for medication and therefore that criteria for admittance to a nursing facility is the criteria most often abused to admit such a patient.

129.   A Nursing home is a 24 hour supervised facility as is a psychiatric hospital.

130. When a patient was to be transferred from a psychiatric hospital to a Nursing Facility for a 180 day stay within Cuyahoga County Mr. O'Boyle would conduct an assessment to determine if the patient fit the criteria.

131. The assessment would then be submitted to the Ohio Department of Mental Health.

132. If Mr. O'Boyle's assessment indicated the patient did not meet the criteria the ODMH would deny transferring the patient for a 180 stay.

133. A patient could also be referred to a nursing facility on a 30 day convalescent waiver. Such a stay could be ordered by a physician at the psychiatric institution by submitting paper work to the Area Agency on Aging an organization also called "Passport."

134. Passport is an Ohio non-profit organization which is set up to screen mentally ill patients. In practice, Passport receives the paperwork from the hospital which justifies that the patient meets an intermediate level of care based on one of the three criteria listed above.

135. Passport then issues an intermediate level of care based on the data secured from the hospital, most often it being the hands on with 2 ADL's. Mr. O'Boyle states that it was Passport's policy to accept the data at face value and not challenge the veracity of the info in lieu of the attending physician's signature on it. He observed that the data was often incongruent with the person's age and physical capacities based on the medical diagnoses. It was also often the case that no medical diagnoses were listed which would support the idea why for example a healthy 30 year old male might need physical assistance with ADL's.

136.    The level of care, although fraudulently obtained by the process referred to above, would allow the patient to be admitted to the nursing facility subject to the Ohio Department of Mental Health assessment. This assessment would occur after the patient was in the nursing facility.

137.    As stated above, an admission to a nursing facility, regardless of the length of stay, is an admission to an intermediate level of care. Although the procedure for handling that 30 day stay is different than the procedure for the 180 day admission, the criteria for admittance to the nursing facility under the 30 day stay is the same as that for the 180 day stay as listed above.

138.    Under this procedure the PASRR Screener, Mr. O'Boyle would be obliged to review the condition of the patient after that patient was transferred to the nursing facility for an initial 30 day convalescent stay and determine if they met the criteria again.

## C. HOW PSYCHIATRIC FACILITIES REFER TO NURSING FACILITIES

139.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

140.    There are many financial reasons why a psychiatric hospital must refer a patient out of their facility.

141.    Admission to a psychiatric facility for a long term stay means a patient must have extensive and severe psychiatric symptoms which preclude the patient being able to meet their needs or ensure their safety outside of a facility that provides 24 hour supervision. Most insurers reimburse up to only a few weeks which often leaves a treatment resistant patient still unstable and psychiatrically non

functional. These patients would then be sent to a nursing facility for what was considered to be care that was an extension of the hospital admission and in essence was often justified because of the obvious nature of the patients need for continued 24 hour supervision. The legitimacy of these kinds of placements is not at issue here.

142.     However, the vast majority of the convalescent placements into the nursing facility from the psychiatric hospital occurred when the patient did not need 24 hour supervision and they did not need any hands on ADL assistance at all. The ease and expediency of the convalescent exemption made the system ripe for abuse. In fact it was the primary etiological factor of the subsequent large scale fraud described here. The nursing homes were all too willing to take these people in as an income source. Entire locked units arose in several of these facilities which helped lay claim to the new market of the nursing facility as housing for the mentally ill. Therefore, there is considerable pressure to discharge patients from the psychiatric facility.

143.     The nursing facilities have tremendous incentives to accept patients, because they can obtain federal funding for those patients. Nursing facilities are paid per patient cared.

144.     When Mr. O'Boyle reviewed the patients who were sent from a psychiatric facility to a nursing facility on a 30 day convalescent stay, he found about half were legitimately sent to such a facility. About half did not meet the criteria for admission to a nursing facility. That would amount to upwards of 1500 fraudulent admissions to nursing facilities in the past six years alone. Each of the defendants

listed in section I. B above is a psychiatric hospital which sent patients to a nursing facility that did not meet the criteria for a nursing facility level of care. Each of the defendants listed in section I. C above is a nursing facility or the owner of a nursing facility that knowingly accepted patients who did not meet the level of care required to be admitted to a nursing facility. Each of the Defendants listed in Section I. C above is either responsible for referring a patient to a nursing facility that did not meet the criteria or an official of a nursing facility who accepted such a patient or in some cases some of these people acted in both capacities.

145.    The SABER Health Care Group's practice was particularly blatant. That company employs people who have a financial incentive to recruit patients for admission. They sometimes act in a legitimate manner by educating hospital staff about the facilities at the nursing facility and sometimes act in a manner which is not legitimate as discussed below.

146.    In addition, several doctors involved, most notably Dr. Rosale Rosales So, order a transfer of a patient from a psychiatric facility to a nursing facility and continue to treat the patient.  See below section on Doctors who treat patients they ordered transferred from one facility to another.

## D. FALSE NURSING HOME ADMISSIONS

147.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

148. Mr. O'Boyle assessed many if not most of the patients transferred from psychiatric facilities to Nursing Homes in Cuyahoga County Ohio over the past six years.

149. All of the records of Mr. O'Boyle's assessments would still be available at the Center for Families and Children, an agency which contracted with ODMH to do the PASRR assessments in Cuyahoga County, Ohio. The agency is located at 4500 Euclid Ave, Cleveland, Ohio 44113 as well as at the Ohio Department of Mental Health.

150. As previously stated, Mr. O'Boyle discovered that approximately half of the patients transferred were in fact transferred to such a facility legitimately. Approximately half of the patients did not meet the criteria listed above for an admission to a nursing facility.

151. He assessed some patients at the psychiatric hospital prior to a request to transfer that patient for a 180 day or indefinite stay in a nursing facility. In some cases, Mr. O'Boyle told the hospital that the patient would not be approved for that stay and the hospital proceeded to change the original request to a 30 day convalescent which could be secured under the Passport waiver procedure. This meant that the psychiatric facility and the nursing facility would both be aware in advance that the placement was inappropriate when the transfer was actually made.

152. Mr. O'Boyle was obliged to assess a patient after their admittance to a nursing facility if they were admitted on the 30 day convalescent stay. He often saw patients he had previously determined did not meet the same criteria under the procedure for a 180 day stay. Some of the residents were denied multiple times

over the course of several years, which meant that both the referring psychiatric facilities and the receiving nursing facilities were aware of the inappropriate nature of the multiple placements.  These patients would have been admitted to a psychiatric hospital, sent for a 30 day convalescent stay at a nursing facility, and then released from the nursing facility some time after the assessment by Mr. O'Boyle indicating that they did not meet the criteria. The patients would be discharged to shelters, group homes, or an independent living situation only to return to a psychiatric hospital and begin the process again.

153. The nursing facility census was highest during the winter months as the recruiters would go into the shelters and tell them to go to the hospital and either say you are homicidal, suicidal, or hearing voices and you can get into a nursing facility with three square meals and a warm, cozy bed.

154. Mr. O'Boyle found many patients who were schooled in the procedures of obtaining stays at nursing facilities.  Such patients knew what to say to be admitted to a psychiatric hospital and then knew the procedures to be moved to a nursing facility.

155. In the case of SABER Healthcare Group, in particular, recruiters would go so far as to tell prospective patients who were in homeless shelters, how to get into psychiatric hospitals. They would advise the patients what to say so that they would be admitted to a short stay in a psychiatric facility which would then refer the patient to a nursing facility.

156. For example, Sharon Davis Robinson worked at Rudwick Manor to ensure that facility kept getting patients.  She has a male colleague, Mike Tulle, who finds

prospects at the men's shelter while she attempts to find patients at a women's shelter. Ms. Robinson's pay is at least in part structured on the number of patients she manages to get admitted to Rudwick Manor. She has been successful in recruiting patients directly out of Homeless Shelters including informing such shelter member what they need to say at a psychiatric hospital to first be admitted in such a facility and then to be transferred to a nursing facility. Invariably such patients are admitted to the nursing facility on a 30 day convalescent transfer with forms showing the patient "needed" 24 hour assistance for 2 ADL's.

157.    While the convalescent transfer is ordered for only 30 days, this transfer generally results in a far longer stay at the nursing facility. By the time the many additional assessments required to actually have a patient removed from a nursing facility can be completed and reviewed by the Ohio Department of Mental Health ("ODMH") and a discharge ordered, a patient who should never have been admitted to a nursing facility will have spent more than two and a half months in a facility on a 30 day convalescent admittance. Mr. O'Boyle estimates the average stay of a convalescent admit to be at least five months because the nursing facilities discovered that the vendor payment rarely stopped even after the 30 day period when the release of a patient had been ordered. That is, thirty days after the State sends a letter of "denial" stating that the resident did not meet the criteria for admission the nursing facilities were able to continue to be paid for such patients. The nursing facility therefore, continued to receive funds for patients ordered discharged and had did not discharge these residents. Some of the residents stay in the nursing facilities for years beyond the time they were denied by ODMH.

## E. MR. O'BOYLE'S ASSESSMENTS

158.  The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

159.  Mr. O'Boyle's assessment of a patient includes a written document which provides details of the patient's condition. All of his assessments of such patients would be kept on file at the Center for Families and Children. *See*, for Example Exhibits 3 & 4 Case histories Names of Patients and Family Redacted.  They would also include his assessment of the patient's need for assistance of the ADL's under which a patient would have been admitted to a nursing facility.

160.  Of course, Mr. O'Boyle's assessments were at odds with the submissions by the psychiatric hospitals that allowed for such admission. Those submissions were generally two page forms which checked the appropriate boxes to indicate sufficient hands on care for an ADL and meet the requirements for an intermediate level of care.

161.  Quite often the people who were admitted under false representations as to their care were in fact repeat admissions. Therefore, all staff involved knew the real status of the patients.  It was quite likely that in such cases, Mr. O'Boyle would be re-reviewing a patient a year or so after a first admittance and find the patient had gone from a psychiatric facility to a nursing facility stayed as long as possible then been discharged by the nursing facility and then gone back to the psychiatric hospital again to be re-admitted.

162.  Nursing Facilities also keep Minimum Data Set sheets or "MDS" Sheet's.  This form includes information on the ADL's and the nursing facilities own

assessment of the patient's needs. The form gets sent later than the original

admission form or the assessment form to the Ohio Department of Jobs and

Family services.  The form does not arrive at the Ohio Department of Jobs and

Family services until well after the initial fraudulent admission of a patient. It is

used to determine the rate a facility would be paid for patient care.  It does not

have a bearing on the admission or discharge of a patient.  Ironically, some

facilities, while fraudulently accepting patients, honestly assess those patients on

these form. SABER Healthcare Group nursing facilities often file MDS forms,

which indicate a patient should not even be in their care.  Other nursing facilities

simply continue to misstate the condition of the patient and receive a higher rate

for that patient's care.

## F. NURSING FACILITIES EXTEND STAYS

163. The allegations contained in the above paragraphs are hereby re-alleged and set
forth fully as above

164. The Nursing Facilities acted to take advantage of the rules in a manner which was
not consistent with providing such 24 hour care. A Nursing facility can charge for
an unoccupied bed up to 30 days for any patient during the course of a calendar
year. The 30 bed hold days were designed to help a resident maintain the
placement when needing overnight stays for various reasons including admission
back into a psychiatric hospital because of a symptom exacerbation, admission
onto a medical floor at a hospital because of a physical ailment, and overnight
visitation a resident might at times have with a friend or family member. The

Nursing facility is not charged against the thirty day admission if the patient spends at least eight hours per day in the facility.

165. Many of the inappropriately admitted patients knew this rule and the nursing facility let them leave the facility on what are referred to as Leaves of Absence "LOA's" The LOA privileges which allow a resident to independently come and go from the facility as they see fit have to be approved by the facility psychiatrist which presupposes that the resident is both physically and psychiatrically stable.

166. They could leave the facility for as much as 32 hours of a 48 hour period and the facility would not be charged for a single lost day. Furthermore, the nursing facility would continue to bill for them as patients who had been admitted to require 24 hour supervision. The independent LOA privileges are particularly egregious in that residents often return either high or intoxicated and often bring the drugs into the facility for distribution among residents

167. This leave award itself is technically legal; however, it demonstrated knowledge that the patient really did not need the care contemplated by admission to a 24 hour supervisory facility like a nursing facility. The patient cannot possibly need 24 hour supervision if they are allowed to leave the facility unattended. Addicts and malingerers will often sign themselves out against medical advice when they have their privileges revoked. Many of the nursing facility workers have referred to the nursing homes as "flop houses" or "glorified hotels".

## G. DOCTORS REFER PATIENTS TO NURSING FACILITIES AND CONTINUE TO TREAT AND BILL FOR THEM

168. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

169. Dr. So, of St. Vincent's Charity Hospital was perhaps the most flagrant example of a doctor who admitted a patient to a nursing facility who did not meet the criteria for such admittance. Her position as a psychiatrist at St. Vincent's Hospital and at SABER owned nursing facilities meant that after she had a patient transferred from St. Vincent's she could continue to treat such patients at the nursing facility for at least a couple of months and charge Medicaid for such treatment.

170. Dr. So among others did this. She was a physician at St. Vincent's Charity Hospital and could order a transfer from that SABER owned hospital to a SABER owned nursing facility. Then she could continue to treat the patient and charge Medicaid for that treatment after a transfer from one facility to the other. Her role as a psychiatrist at both the hospital and the nursing facility was a conflict of interest which she used to effectively send patients to herself. Mr. O'Boyle also observed that it was common to hear a resident at the time of his assessment respond state that the resident did not know why he was in the nursing facility, but that Dr. So said he had to go there. This response was invariably to the question.

171. This exploitation of vulnerable people would end up in their being in the nursing facility for lengthy periods of time. Facilities systematically sabotaged their attempts to get out by directing them to go back and forth between Drs., social workers, or nurses whereby this runaround was strategically maintained.

172. Other psychiatrists who engaged in this same practice who were not affiliated with Saber include a Dr. Saroj Brar who sent patients between Lakewood hospital and the Cityview Nursing facility and Dr. Ranjan who engages in the same practice between Marymount Hospital and the Aristocrat Berea nursing facility.

## 3. EXAMPLES OF CASE HISTORIES

173. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

174. In the case presented as Exhibit 2, A 40 year old Male patient was assessed for admission on July 7, 2004. The Patient was evaluated by Mr. O'Boyle on August 31 of 2004.

175. Mr. O'Boyle noted:

> ...he had about 12 subsequent admits between the CPI [Cleveland Psychiatric Institute] St Vincent Charity & Kaiser Hospitals. His diagnoses include schizophrenia & cocaine abuse. He was recently released from the Chillicothe state penitentiary after what he claims to be a 6 Month incarceration for "shoplifting." He is clearly capable of functioning outside the context of a nursing facility. The NF should be quite concerned about finding him "hovering over an elderly resident in her room". Discharge to a shelter might be appropriate.

176. Mr. O'Boyle also filled out a sheet showing that the patient needed no assistance with any of the ADL's, which would qualify him for admission.

177. This patient received multiple admissions. In fact the patient was readmitted to a nursing facility a year after Mr. O'Boyle's assessment indicated the patient should not have been admitted His Admission form states he needed assistance as in hands on assistance in a 24 hour care facility, for both Bathing and Dressing, less than a year after he was assessed as not needing such care. This was for what was

supposed to be a chronic condition in a 40 year old man. Of course, this admission would constitute the 3rd such admission for this resident.

178. In the case presented as Exhibit 3 Mr. O'Boyle assessed a patient on February 8, 2007 as follows:

> NAME REDACTED is a 51 year old divorced Hispanic male who has an adult son and an adolescent daughter with whom he has minimal contact. He was last employed as a security guard for the city of Cleveland in 2005 and he has in a current disability application based on his HIV status. He claims to have been homeless when he walked into the University Hospital...claiming to be depressed a with a tox screen which was positive for cocaine & opiates. He spent a few days at UH [University Hospital] before being transferred to the Rudwick Manor NF on a now expired 30 day convalescent. He continues to use drugs while at the NF. He is HIV +
>
> ...
>
> He states that this is the first time he has ever had a pysch admit and there is no data to disconfirm this...
> ...
>
> He was at his brothers house who reportedly "kicked him out, he immediately went to UH, thus his claim of being homeless.
>
> ...
>
> Reports of "multiple incarcerations" presumably for drug related offenses.

179. In the part of a form which asks what services provided by the Nursing facility meet the individual's mental health needs, Mr. O'Boyle simply stated: "None"

180. In the part of a form asking to describe the individual's ability or level of assistance required to comply with the psychotropic medication regimen, Mr. O'Boyle simply stated: "Independently"

181. With respect to the patients history of substance abuse Mr. O'Boyle stated:

> Says he had been in CD [chemical dependency] 4X of which the veracity of this is unclear, he has 2X tested positive at the NF after coming back from 3 day leaves, continues to maintain privileges.

182. Under the part of the form asking about significant behavioral patterns Mr. O'Boyle stated:

> He comes & goes from the NF on LOA privilege and has 2X tested positive for opium upon return. He is likely malingering the depression while the progress note from the DC psychologist at the NF states that he is "he is working hard at maintaining sobriety".

183. Mr. O'Boyle also noted that this patient was "clearly competent"

184. On a PASRR Evaluation Summary form Mr. O'Boyle makes clear that this admittance was not medically necessary and should not have been allowed:

> He does not need a NF he needs a treatment program. It is unclear why they do the drug testing as there is no consequence for a positive test. He can continue to LOAs + continue to reside at the NF. Despite his documented drug use while at the NF...

185. This case history demonstrates the nursing facility was more concerned with continuing to be able to charge for this patient, than for the safety or well being of the other residents.

186. The admission and continued care for a patient whose real condition of a drug addiction is clearly not in the interest of other legitimately admitted patients in such a facility. Sadly this is unfortunately typical of the priorities at these facilities.

187. In another case history Mr. O'Boyle assessed the patient on December 29, 2003 as follows:

> He is high functioning when not in the hospital when not in the hospital threatening suicide. He lives independently in his own condominium and can do ADL & IADL tasks independently. His pattern evidences Axis II pathology, espec. Narcissistic and borderline personality traits which are now playing out via a threat that he will kill hi9mself if he does not get to

stay in the NF another 3 months to be close to his new girlfriend, who is also a resident. C[ase] Manager agrees that he does not require a NF, a meeting is in the works which includes this writer to process placement options + behavioral strategies to deal with his manipulative behavior.

188. Mr. O'Boyle also assessed the patient in November of 2005 as a result of admittance to a nursing facility. He filled out a form on the Activity of Daily Living Summary which showed the patient to be independent in all ADL's.

189. Mr. O'Boyle's Assessment of November 8, 2005 includes these comments:

> This clearly manipulative gentleman tries and succeeds at getting into the Greenbrier NF for reasons which range from pseudosuicidality, to being with a girlfriend, to now avoiding the legal consequences of his exhibitionism. The placement is not only inappropriate but it is quite counter therapeutic helping to "rescue" him + avoid dealing with the situation. He needs a comprehensive treatment program which deals with his addiction, one attached to the legal system, which would include incarceration for future offense.

190. Mr. O'Boyle's frustration with the continuing admittance of a patient into nursing facilities who, not only did not meet the criteria for care, but also put other patients at risk is evident in his assessment of April 18, 2007 of the same patient:

> See previous umpteen assessments as this one should probably not be dignified by a determination because of the almost profane nature of the admission. He was last seen by me on 12-6-05 at the same NF and predictably denied. In 15 months he has literally had as many as 10 more pysch admits. In essence, he exposes himself to young girls out his window, he then drives himself to the hospital to avoid the police, and "atone for my guilt." He then says he wants to go on a convalescent NF admit + he is accommodated, stays a month gets bored returns to his condo to begin the debacle again. He is not suicidal or depressed, he is an exhibitionist who the system allows to hide in a NF.

191. The next case history involves a 40 year old woman who was kept in a nursing facility for more than two years after a denial letter was issued by the Ohio Department of Mental Health.

192. The referring admission document of August 31, 2004 used to send her to the nursing facility states she is "Schizoaffective" but also states her prognosis to be "good."

193. It notes she was "in jail for domestic violence charge. Judge willing to release patient to Windsor but requesting a tx [treatment center] has past hx [history] of crack and etoh [alcohol] abuse."

194. The Rap Narrative Report from Cleveland Rehab, the nursing facility which accepted the patient itself shows her independent of most of her ADL's.

195. On November 26, 2004 a denial letter from the Ohio Department of Mental Health was issued which should have terminated her stay in the nursing facility no later than 30 days thereafter.

196. Mr. O'Boyle filed an assessment well after the denial letter was issued. In fact, more than two years later the patient was still being kept in the nursing facility:

> This woman was assessed at the time of an expired convalescent stay in Cleve Rehab on 11/1/04 and was denied. Incredibly she is still at Cleve Rehab on the same placement, has never left the facility and has now been there for 2 1/2years! She is quite stable upon presentation and does not need to be in a NF according facility SW [social worker] and charge nurse.

## 4. PREVIOUS REPORTS BY THE RELATOR TO THE GOVERNMENT AND OTHER SOURCES

197. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

198. We re-emphasize that as of the filing of this Complaint there has not been any public disclosure of the allegations contained herein.

199. However, we note that the Plaintiff in his effort to prevent the fraud from continuing contacted the Office of Congressman Dennis Kucinich prior to filing this complaint and prior to notifying the Government that he would be filing any kind of legal action.

200. That office as well as a private attorney advised the Relator to gain publicity for this issue to further his cause of stopping the fraud discussed herein.

201. The Relator then contacted the Cleveland Plain Dealer among other media outlets and also contacted the State of Ohio Attorney General's Office.

202. No newspaper article has appeared and no report has been issued by any agency as to the Relator's allegations at this time.

203. Only after the Relator initiated those contacts did he learn from an attorney that he could file a case under the *qui tam* provisions of the False Claims Act. 31 USC §§ 3729 *et. seq.*

### III. VIOLATIONS OF THE FALSE CLAIMS ACT

### COUNT I

204. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

205. The defendants knowingly, willfully and recklessly billed and caused to be billed government programs including, but not limited to Medicaid based on fraudulent referrals to and admissions into nursing facilities.

206. Each of the above-named Defendant psychiatric facilities and their officials (listed above in sections II. 1 B and D) through such fraudulent referrals has caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or

indirectly causing the United States to be billed for patients who were not qualified for care at a nursing facility.

207. As a result of Defendants' actions, the United States has paid thousands of false claims and spent millions of dollars pursuant to Government insurance contracts unnecessarily and as a result of Defendants' fraudulent and/or illegal conduct.

208. Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

209. Each and every such fraudulently billed claim is also subject to a civil fine under the False Claims Act under which each falsely coded case represents a false claim to the government subject to a fine of five to ten thousand dollars ($5,000 – $10,000)

<u>COUNT II</u>

210. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

211. The defendants knowingly, willfully and recklessly billed and caused to be billed government programs including, but not limited to Medicaid based on fraudulent referrals to and admissions into nursing facilities.

212. Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for patients who were not qualified for care at a nursing facility.

213. The Defendant nursing facilities, their owners and officials (listed above in section II 1 C and D) fraudulently admitted patients to nursing facilities, when

officials at the nursing facilities knew or should have known the patient did not meet the criteria for admission

214. As a result of Defendants' actions, the United States has paid thousands of false claims and spent millions of dollars pursuant to Government insurance contracts unnecessarily and as a result of Defendants' fraudulent and/or illegal conduct.

215. Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

216. Each and every such fraudulently billed claim is also subject to a Civil fine under the False Claims Act under which each falsely coded case represents a false claim to the government subject to a fine of five to ten thousand dollars ($5,000 – $10,000)

## COUNT III

217. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

218. The defendants knowingly, willfully and recklessly billed and caused to be billed government programs including, but not limited to Medicaid based on fraudulent referrals to and admissions into nursing facilities.

219. Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for patients who were not qualified for care at a nursing facility.

220. In addition to the fraudulent admission of patients to nursing facilities when transferred from a psychiatric facility, officials of the hospital referring the patient or the nursing facility accepting the patient and in some cases these officials work

in both capacities, also knowingly, willfully and recklessly billed to care for the patient in their personal capacities as care givers.

221. These medical professionals caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for patient care for patients who were not qualified for care at a nursing facility and billing for additional care.

222. As a result of Defendants' actions, the United States has paid thousands of false claims and spent millions of dollars pursuant to Government insurance contracts unnecessarily and as a result of Defendants' fraudulent and/or illegal conduct.

223. Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

224. Each and every such fraudulently billed claim is subject to a Civil fine under the False Claims Act under which each falsely coded case represents a false claim to the government subject to a fine of five to ten thousand dollars ($5,000 – $10,000)

<u>COUNT IV</u>

225. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

226. Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for patients who were not qualified for care at a nursing facility.

227. In addition to the fraudulent admission of patients to nursing facilities, patients were often knowingly, willfully and recklessly, kept at the nursing facility in a

government funded program after officials of the nursing facility knew the patient should be discharged under the criteria for intermediate care.

228.     As a result of Defendants' actions, the United States has paid thousands of false claims and spent millions of dollars pursuant to Government insurance contracts unnecessarily and as a result of Defendants' fraudulent and/or illegal conduct.

229.     Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

230.     Each and every such fraudulently billed claim is subject to a Civil fine under the False Claims Act under which each falsely coded case represents a false claim to the government subject to a fine of five to ten thousand dollars ($5,000 – $10,000)

## COUNT V

231.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

232.     The defendants knowingly, willfully and recklessly billed and caused to be billed government programs including Medicaid based on fraudulent admissions to nursing facilities.

233.     Officials at the nursing facility arranged for such admissions advising a patient what to say or otherwise recruiting a patient to be admitted eventually into a nursing facility.

234.     The defendants, thereby, caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for patients who were not qualified for care at a nursing facility.

235.   As a result of Defendants' actions, the United States has paid hundreds of false claims and spent millions of dollars pursuant to Government insurance contracts unnecessarily and as a result of Defendants' fraudulent and/or illegal conduct.

236.   Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

237.   Each and every such fraudulently billed claim is subject to a Civil fine under the False Claims Act under which each falsely coded case represents a false claim to the government subject to a fine of five to ten thousand dollars ($5,000 – $10,000)

238.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

239.   Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for patients who were not qualified for care at a nursing facility.

240.   In addition to the fraudulent admission of patients to nursing facilities, patients were often kept at the nursing facility in a government funded program after the point at which they should have been released pursuant to a denial letter or other order from a government office indicating the resident should be released from the facility.

241.   As a result of Defendants' actions, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars pursuant to Government insurance contracts unnecessarily and as a result of Defendants' fraudulent and/or illegal conduct.

242. Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

243. Each and every such fraudulently billed claim is subject to a Civil fine under the False Claims Act under which each falsely coded case represents a false claim to the government subject to a fine of five to ten thousand dollars ($5,000 – $10,000)

## COUNT VI

244. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

245. Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for patients who were not qualified for care at a nursing facility.

246. In addition to the fraudulent admission of patients to nursing facilities, patients were often kept at the nursing facility in a government funded program and granted a Leave of Absence "LOA" which allowed such a patient to leave the facility and be on their own for a period of time which, in and of itself, indicated that resident did not need the 24 hour care contemplated by their admittance to a nursing facility.

247. As a result of Defendants' actions, the United States has paid thousands of false claims and spent millions of dollars pursuant to Government insurance contracts unnecessarily and as a result of Defendants' fraudulent and/or illegal conduct.

248. Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

249.    Each and every such fraudulently billed claim is subject to a Civil fine under the
        False Claims Act under which each falsely coded case represents a false claim to
        the government subject to a fine of five to ten thousand dollars ($5,000 – $10,000)
        WHEREFORE, plaintiff demands judgment for all of the following:

   a)   That this Court enter a judgment against defendants in an amount equal to three
        times the amount of damages the United States Government has sustained
        because of defendant's charges fraudulently made to government agencies
        including Medicaid for bills that are not supported by the medical record.

   b)   That this Court enter a judgment against the defendants in an amount equal to
        three times the amount awarded to the defendants for bills which are not
        supported by the medical record plus a civil penalty of $5,000 to $10,000 for each
        violation of 31 U.S.C. section 3729 or any applicable law or administrative
        guideline with respect to billing Medicaid or Medicare.

   c)   That this Court enter a judgment against defendants in an amount equal to three
        times the amount of damages the United States Government has sustained
        because of defendants' charges for patients fraudulently referred from psychiatric
        facilities to nursing facilities made to government agencies including Medicaid
        plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. section
        3729 et. seq. or any applicable law or administrative guideline with respect to
        billing Medicaid.

   d)   That this Court enter a judgment against defendants in an amount equal to three
        times the amount of damages the United States Government has sustained
        because of defendants' charges to government agencies including Medicaid for

patients fraudulently accepted by nursing facilities plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. section 3729 or any applicable law or administrative guideline with respect to billing Medicaid.

e) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' charges to government agencies including Medicaid for patients fraudulently referred to and accepted by nursing facilities who were also treated by medical personnel who were in any way involved in the referral or who extended the patients' stay in such a facility in order to fraudulently inflate their personal billing plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. section 3729 et. seq. or any applicable law or administrative guideline with respect to billing Medicaid.

f) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' charges to government agencies including Medicaid for patients fraudulently referred to or accepted by nursing facilities who were kept at a nursing facility after they should have been released from such a facility pursuant to an official notice such as a denial letter plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. section 3729 or any applicable law or administrative guideline with respect to billing Medicaid.

g) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' charges to government agencies including Medicaid for

patients fraudulently referred to or accepted by nursing facilities who were kept at a nursing facility after they should have been released from such a facility based on the knowledge of officials at such a facility plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. section 3729 or any applicable law or administrative guideline with respect to billing Medicaid.

h) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' charges to government agencies including Medicaid for patients fraudulently referred to or accepted by nursing facilities who were kept at a nursing facility after they should have been released from such a facility based on allowing such a patient a leave of absence or any other judgment as to that patient's care which should have indicated the patient did not meet the requirements for such care plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. section 3729 or any applicable law or administrative guideline with respect to billing Medicaid.

i) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' charges to government agencies including Medicaid for patients fraudulently referred to or accepted by nursing facilities which created any additional proximate expense such as the cost of transferring that patient or the damages created by having inappropriately admitted patients stay at a facility with patients who legitimately needed such care plus a civil penalty of $5,000 to

$10,000 for each violation of 31 U.S.C. section 3729 or any applicable law or administrative guideline with respect to billing Medicaid.

j) That Relator/Plaintiff be awarded all reasonable attorneys fees and costs, pursuant to 31 U.S.C. § 3730 subsection (d) (1) (b).

k) That in the event the United States Government continues to proceed with this action, the Relator/Plaintiff be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of any award or the settlement of the claims;

l) That in the event that the United States Government does not proceed with this action, the Relator/Plaintiff be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of any award or settlement;

m) That the Relator/Plaintiff be awarded pre-judgment and post judgment interest;

n) That the Relator/Plaintiff be awarded any relief to which he is entitled at law;

o) That a trial by jury be held on all issues;

That the United States Government and the Relator/Plaintiff receive all relief both at law and at equity, to which they may be entitled.

Respectfully submitted by:

Tate & Renner

Richard R. Renner, #0029381
505 N. Wooster Ave.
P.O. Box 8
Dover, Ohio 44622-0008
(330) 364-9900
(330) 364-9901 FAX
rrenner@igc.org

## JURY DEMAND

Plaintiff demands a trial by jury.

Richard R. Renner #0029381
Attorney for Plaintiff

September 14, 2007

c:\clients\o'boyle\oboylecomplaint[1].doc

Page 48